IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIM. ACT. NO. 3:17cr444-WKW |
| | )                (WO) |
| GUILLERMO GONZALEZ-ZEA | ) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant Guillermo Gonzalez-Zea ("Gonzalez-Zea") was charged on October 17, 2017, in a single count indictment with being an illegal alien in possession of a firearm and live ammunition in violation of 18 U.S.C. § 922(g)(5) and § 924(a)(2). On February 5, 2018, Gonzalez-Zea filed a motion to suppress all physical items seized, statements made, and other "fruits" obtained as a result of "an unlawful traffic stop and unreasonable detention" on September 26, 2017, in Heflin, Alabama, in the Middle District of Alabama. (Doc. # 28 at 1). Claiming that the stop of his vehicle were unsupported by reasonable suspicion, Gonzalez-Zea contends that all evidence seized and statements made should be suppressed because the traffic stop violated the Fourth Amendment to the United States Constitution. Gonzalez-Zea also contends that the duration of the traffic stop was unreasonably extended. (*Id*. at 3). Finally, Gonzalez-Zea argues that his consent to search his residence was "coerced and obtained in a means insufficiently distinguishable from [his] illegal seizure." (*Id*).

On April 4, 2018, the Court held an evidentiary hearing on the motion to suppress. For the reasons which follow, the Court concludes that the motion to suppress is due to be DENIED.

**FACTS**

Before dawn on the morning of September 26, 2017, United States Department of

Homeland Security Immigration and Customs Enforcement deportation officers Christopher Purdy, Scott Skillern and Waylon Hinkle were surveilling a residence located at 30926 Highway 431, in Heflin, Alabama. The officers were trying to locate an Immigration and Customs Enforcement fugitive named Jose Rodolfo Alfaro-Aguilar for whom there was a warrant for his deportation.[1]  (Doc. # 47, Evid. Hrg Tr. at 63).  Officer Purdy had been informed by an officer in Atlanta that the fugitive might be living at the address because utilities had been connected in the fugitive's name at that address.  The officers arrived at the residence before 5:00 a.m. and parked within sight of the house.

Officer Purdy observed a male leave the residence in a vehicle but Purdy was parked too far away to identify the man as the fugitive.  Purdy informed Skillern that a male had left the residence in the vehicle, and Skillern stopped the vehicle a short distance from the house to see if the driver was the fugitive.  It is undisputed that the only reason Skillern stopped the vehicle was simply to ascertain whether the driver of the vehicle was the fugitive.  Skillern activated his lights and siren.  The defendant, who was driving the vehicle, stopped.  Skillern approached the vehicle and asked the defendant his name.  Recognizing that the name was not that of the fugitive, Skillern asked for identification.  The defendant produced an identification document issued by Mexico.  Skillern asked for additional identification issued by the United States but the defendant stated he did not have identification because he was in the country illegally.  All of this occurred within a minute of the stop of the defendant.

During Skillen's short conversation with the defendant, officer Hinkle arrived.  At that

---

[1] Alfaro-Aguilar was ordered removed in July 2016.  (Doc. # 47, Evid. Hrg Tr. at 64).

2

point, the deportation officers were sure the defendant was not the fugitive. The defendant was not detained or placed under arrest. But the officers explained to the defendant that they were looking for a fugitive and asked if there was anyone else in the house. The defendant replied that he lived alone, and Skillern asked if they could "go back and take a look." (Doc. # 47, Evid. Trans. at 15).

The officers and the defendant drove back to the residence in their respective vehicles. Gonzalez-Zea unlocked the door and allowed the officers to enter the house. When the officers entered a bedroom, they saw a shotgun in the corner and found a rifle in a closet. Once the officers found firearms in the residence, Hinkle advised the defendant of his rights in Spanish. The defendant indicated that he was willing to answer questions and admitted that there was another firearm in the house. After recovering the third weapon, the defendant was arrested.

## DISCUSSION

### A. Validity of Investigatory Stop

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Under *Terry v. Ohio*, 392 U.S. 1 (1968), "even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity."[2] *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (quoting *United States*

---

[2] The government does not argue, and the court does not find, that the agents had probable cause to initiate a traffic stop.

*v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)). "Where police have been unable to locate a person suspected of involvement in a past crime, [they have] the ability to briefly stop that person, ask questions, or check identification," and "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985).

For brief investigatory stops, the Fourth Amendment is satisfied "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The reasonable suspicion required for a *Terry* stop is more than a hunch, and considering the totality of the circumstances, must be supported by some minimal level of objective justification that the person engaged in unlawful conduct. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). Reasonable suspicion "is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, *INS v. Delgado*, 466 U.S. 210, 217 (1984), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found." *Tapia*, 912 F.2d at 1370. Reasonable suspicion requires "'at least a minimal level of objective justification for making the stop.'" *United States. v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). It does not require officers to catch the suspect in a crime. Instead, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).

The "reasonable suspicion" standard requires that, to justify an investigatory stop, a police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (footnote omitted)); *see also United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989) (citing *Sokolow*, 490 U.S. at 7) (holding that reasonable suspicion "requires that the police articulate facts which provide some minimal, objective justification for the [investigatory] stop."). When assessing the facts articulated by an officer to determine whether an investigatory stop is warranted, a court must view them in totality and cannot engage in a "'divide-and-conquer analysis[.]'" *United States v. Bautista-Silva*, 567 F.3d 1266, 1273-74 (11th Cir. 2009). Reasonable suspicion may exist based on the totality of the circumstances even if each individual fact articulated by the officer, standing alone, is susceptible of an innocent explanation. *Id.*; *see also Arvizu*, 534 U.S. at 274-75. Moreover, "officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

The court must decide whether, taken together and in light of the deportation officers' experience, the factors articulated by the officers gave rise to "reasonable suspicion, grounded in specific and articulable facts," that the fugitive was driving the vehicle they observed leaving the residence. *See Hensley*, 469 U.S. at 229; *see also Arvizu*, 534 U.S. at 273 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have

5

said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."). The court finds that, under the totality of the circumstances known to the deportation officers, *Acosta*, 363 F.3d at 1145, and in light of the officers' experience and training, *Arvizu*, 534 U.S. at 273, it was reasonable for the officers to suspect that the driver of the vehicle may have been the fugitive they sought. *See Cortez*, 449 U.S. at 418 (holding that reasonable suspicion "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers").

Officer Purdy had been informed by agents in Atlanta that utilities had been connected at the residence in the fugitive's name and using his social security number. The officers in Atlanta had run the fugitive's name, date of birth and social security number through a database which revealed the Heflin address. The officers knew that the fugitive's age, height, weight and ethnicity. Purdy testified that they were looking for an Hispanic male "roughly in his mid or late forties." (Doc. # 47, Evid. Hrg Tr. at 75). Skillern testified that they were looking for an Hispanic male of a "certain height and weight." (*Id*. at 33). Hinkle was aware that the fugitive they sought was a Honduran national whose last known address was the residence in Heflin, Alabama. (*Id*. at 58).

Purdy also accessed the Department of Homeland Security's Enforcement and Removal Module (EARM) to secure a report on Alfaro-Aguilar. Alfaro-Aguilar's EARM report indicated

6

that he was 48 years old, Honduran, and using a particular social security number.[3] (Def's Ex. 5) Purdy was aware that the officers in Atlanta had run a Clear report on Alfaro-Aguilar. (Doc. # 8). Purdy ran the report to confirm the information provided to him by the officers in Atlanta. The Clear report also confirmed the Heflin address as the last known address of an individual using the same social security number as Alfaro-Aguilar. (*Id.*) Based on the objective facts, the court concludes that the initial investigatory stop of the vehicle was not in violation of the Fourth Amendment because the officers had reasonable suspicion, supported by specific, articulable facts, to stop the driver of the vehicle for the purpose of identification. *Hensley*, 469 U.S. at 229 (holding that, "[w]here police have been unable to locate a person suspected of involvement in a past crime, [they may] briefly stop that person, ask questions, or check identification,"); *see also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) ("[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable."). This stop was reasonable.

### B. Scope and Duration of the Investigatory Stop

Next, Gonzalez-Zea asserts that the duration of the stop was improperly extended once Skillern determined that he was not the fugitive. When Skillern approached the vehicle, he asked Gonzalez-Zea for identification. This he was clearly permitted to do. Skillern was entitled to check Gonzalez-Zea's identification "including questioning the driver . . ., requesting

---

[3] In accordance with the E-Government Act of 2002, as amended on August 2, 2002, and M.D. Ala. General Order No. 2:04mc3228, the court declines to reveal the personal identifier.

consent to search . . . *and* running a computer check for outstanding warrants." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (emphasis in original). "Mere questioning . . . is neither a search nor a seizure." *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001).

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage – provided they doe not induce cooperation by coercive means.

*United States v. Drayton*, 536 U.S. 194, 201-02 (2002). *See also, United States v. Baker,* 290 F.3d 1276 (11th Cir. 2002). "Typically, . . . the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

When Gonzalez-Zea volunteered that he was in the country illegally, Skillern explained that the officers were seeking a fugitive and asked Gonzalez-Zea for his assistance. Gonzalez-Zea agreed to assist the officers and consented to a search of his residence. The unrebutted evidence demonstrates that Skillern asked Gonzalez-Zea for his assistance and permission to search his residence, and Gonzalez-Zea gave the officers consent. At that juncture, Gonzalez-Zea's consent fundamentally altered the nature of the encounter – from a brief investigatory stop into a consensual encounter.

### C. Search Subsequent to Investigatory Stop

In his motion to suppress, Gonzalez-Zea argues that his consent to the search of his residence was coerced and not sufficiently attenuated from the improper traffic stop. At the evidentiary hearing on the motion to suppress, the evidence clearly demonstrated and the court finds that Skillern asked Gonzalez-Zea for permission to search his residence to locate the alien fugitive, and Gonzalez-Zea consented to the search. The court finds that Gonzalez-Zea's consent to search was voluntary and not the product of any force or coercion. *See generally United States v. Desir*, 257 F.3d 1233, 1236 (11th Cir. 2001). "A consensual search is constitutional if it is voluntary; if it is the product of an "essentially free and unconstrained choice."" *Purcell,* 236 F.3d at 1281. *See also Acosta*, 363 F.3d at 1151. When the officers searched the bedroom of the residence, they observed in plain view two firearms. "A consensual search is manifestly reasonable so long as it remains within the scope of the consent." *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992).

### CONCLUSION

For the reasons as stated, the court finds that the defendant's constitutional rights were not violated, and  it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress (doc. # 28) be DENIED. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **August 2, 2018.** A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate

Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11ᵀᴴ Cɪʀ. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 19th day of July, 2018.

/s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE