IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 3:17-CR-444-WKW |
| | ) | [WO] |
| GUILLERMO GONZALEZ-ZEA | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Immigration and Customs Enforcement (ICE) deportation officers linked a fugitive to a house in Heflin, Alabama, so they put the house under surveillance. The officers saw a man leave the house and get in a car, but they could not tell who the man was, so they stopped him and asked for his ID. The man was Defendant Guillermo Gonzalez-Zea. Gonzalez-Zea identified himself, said he lived alone in the house, and admitted that he was an illegal alien. The officers recognized that Gonzalez-Zea was not the fugitive they were after, but they still asked to search his house. Gonzalez-Zea consented. Once inside the house, the officers spotted several guns in plain view, so they arrested Gonzalez-Zea.

The United States charged Gonzalez-Zea with being an illegal alien in possession of a firearm and live ammunition. Now before the court is Gonzalez-Zea's Motion to Suppress (Doc. # 28), in which he argues that the officers: (1) lacked reasonable suspicion to stop his car; (2) unreasonably extended the vehicle

stop; and (3) did not get valid consent to search his house.  After an evidentiary hearing, the Magistrate Judge recommended that the court deny the motion.  (Doc. # 56.)  Gonzalez-Zea objected to the Magistrate Judge's factual findings and legal conclusions.  (Doc. # 57.)

The court agrees with the Magistrate Judge's conclusion, but it expands the supporting rationale and corrects minor misstatements of the facts.  Based upon the applicable law and a thorough review of all of the evidence, the Motion to Suppress is due to be denied.

## II.  STANDARD OF REVIEW

When a party objects to a Magistrate Judge's Report and Recommendation, the district court must review the disputed portions *de novo*.  28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."  Fed. R. Crim. P. 59(b)(3).

*De novo* review requires that the district court independently consider factual issues based on the record.  *Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990).  If the Magistrate Judge made findings based on witness testimony, the district court must review the transcript or listen to a recording of the proceedings.  *Id*.  The district court cannot reject a credibility determination without rehearing live testimony.  *United States v. Powell*, 628 F.3d 1254, 1257 (11th Cir.

2010). But the district court may, without holding a new hearing, modify findings in a way that is consistent with the Magistrate Judge's credibility determination. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1240–41 (11th Cir. 1982).

### III. FACTS

On September 26, 2017, ICE deportation officers Christopher Purdy, Scott Skillern, and Waylon Hinkle (together, "the officers") staked out a house located at 30926 Highway 431 in Heflin, Alabama. The officers were pursuing a man named Jose Rodolfo Alfaro-Aguilar, an illegal alien with an administrative warrant out for his arrest. (Doc. # 46-3, at 113.) But as things turned out, the officers ended up arresting Defendant Guillermo Gonzalez-Zea instead.

The officers did not know for sure where Alfaro-Aguilar lived. (*See* Doc. # 46-3, at 11–13; Doc. # 47, at 65, 69.) But Officer Purdy got a lead from colleagues in Atlanta that Alfaro-Aguilar might be in Heflin. (Doc. # 47, at 66.) Purdy verified that lead. (Doc. # 47, at 69.) As he explained at the evidentiary hearing, there was a Social Security number in ICE's file on Alfaro-Aguilar. (Doc. # 46-3, at 11; Doc. # 47, at 70.) And according to a database, the same Social Security number was associated with a man named Jose Sanchez — a man with twenty-six possible aliases and fifteen possible addresses. (Doc. # 46-3, at 27–33; Doc. # 47, at 71–72.)[1] The

---

[1] Purdy could not remember whether he searched the database for the Social Security number or for Jose Sanchez. (Doc. # 47, at 71.)

first of those addresses was 30926 Highway 431 in Heflin. The Social Security number used by both Alfaro-Aguilar and Sanchez had been used to open a utility account at that address. (Doc. # 46-3, at 29; Doc. # 47, at 77.)[2]

Officers Purdy, Skillern, and Hinkle went to Heflin to stake out the house. (Doc. # 47, at 5, 48, 63.) They got to the house between 5:00 and 6:00 a.m. (Doc. # 47, at 7.) Purdy and Skillern parked their cars about 50–75 yards from the end of the driveway (Doc. # 47, at 6–7, 74), and Hinkle was at a store a few minutes away (Doc. # 21, at 5; Doc. # 47, at 48).

Sometime before dawn, Purdy saw a man leave the house, get in a car, and start driving away. (Doc. # 47, at 10, 74.) The man drove past where Skillern was parked. (Doc. # 47, at 10.) Neither Purdy nor Skillern could tell whether Alfaro-Aguilar was the driver. (Doc. # 47, at 10, 77). Skillern flipped on his car's siren and flashing red and blue lights; the suspect vehicle stopped; and Skillern went to identify the driver. (Doc. # 47, at 10–11, 17.) Purdy stayed put to watch the house (Doc. # 47, at 14, 43, 78), while Hinkle came to help Skillern (Doc. # 47, at 48). The sole purpose of this vehicle stop was to determine whether the driver was the fugitive Alfaro-Aguilar. (*See* Doc. # 34, at 2; Doc. # 47, at 32; Doc. # 55, at 2.)

---

[2] The Magistrate Judge found that "Purdy had been informed by an officer in Atlanta that . . . utilities had been connected in the fugitive's name at that address." (Doc. # 56, at 2; *see also* Doc. # 56, at 6.) That overstates the evidence. Purdy testified that *a* utility had been connected at the house using the Social Security number also used by the fugitive. (Doc. # 47, at 69.) There is no evidence that the utility was connected in Alfaro-Aguilar's name.

But Alfaro-Aguilar was not the driver; Defendant Gonzalez-Zea was behind the wheel. When asked, Gonzalez-Zea gave Skillern his name, which Skillern recognized "didn't match the person we were looking for." (Doc. # 47, at 11.) Skillern then asked for identification, and Gonzalez-Zea handed the officer a Mexican ID card. (Doc. # 47, at 11–12, 38–39.) Skillern asked for a driver's license, but Gonzalez-Zea replied that he did not have one. When asked why, he admitted that he was in the United States illegally. (Doc. # 47, at 12, 38–40.)

At this point, the vehicle stop had taken only a "couple minutes" (Doc. # 47, at 42, 49, 60), but Skillern was already "pretty positive" that Gonzalez-Zea was not Alfaro-Aguilar (Doc. # 47, at 14).[3] So Skillern told Gonzalez-Zea that the officers were looking for a fugitive and asked him who lived in the house. Gonzalez-Zea answered that he lived there alone. (Doc. # 47, at 14.)

Skillern then asked if the officers could go inside the house to "take a look." Gonzalez-Zea did not object. (Doc. # 47, at 15.) Skillern did not tell Gonzalez-Zea that he had a right not to consent to a search. (Doc. # 47, at 42.)

By the time Gonzalez-Zea agreed to the search, Hinkle had arrived on the

---

[3] In addition to his name and the Mexican identification card, there were other indications that Gonzalez-Zea was not Alfaro-Aguilar. Skillern noticed that Gonzalez-Zea is missing several fingers and has discolored pigment on his hands and arms. (Doc. # 47, at 39.) That information did not appear in Alfaro-Aguilar's file. (*See* Doc. # 46-3, at 11–13; Doc. # 47, at 39.) Also, Alfaro-Aguilar is a Honduran citizen, but Gonzalez-Zea produced a Mexican ID card. (Doc. # 46-3, at 11; Doc. # 47, at 39, 72.)

scene, meaning that two officers were by Gonzalez-Zea's car. (Doc. # 47, at 13, 42, 60.) Both officers, Skillern and Hinkle, wore ballistic vests emblazoned with police and ICE insignia. Their pistols were visible, though not drawn. (Doc. # 47, at 15, 40, 46–47, 52.) Skillern did not tell Gonzalez-Zea that he was free to go. (Doc. # 47, at 40.) Neither officer read Gonzalez-Zea his *Miranda* rights before Skillern asked to search the house. (Doc. # 47, at 40, 42, 57.) There is no evidence that Skillern turned off his car's lights and siren. And there is no evidence that Skillern gave Gonzalez-Zea's Mexican ID card back to him.[4]

After Gonzalez-Zea agreed to let the officers search his home, Gonzalez-Zea drove his own car the short distance back to the house. The officers followed in their own cars. (Doc. # 47, at 17.) The officers did not search or handcuff him. (Doc. # 47, at 15, 53.) Gonzalez-Zea unlocked the door and let the officers inside. (Doc. # 47, at 18.) An officer then stepped into the bedroom and saw a shotgun in the corner of the room. (Doc. # 47, at 18–19, 53.) An officer also saw a rifle in an open closet. (Doc. # 47, at 53.) Both firearms were in plain view. Hinkle read Gonzalez-Zea his *Miranda* rights in Spanish after they found the two guns. (Doc. # 47, at 22–26, 44, 55.) Gonzalez-Zea then led the officers to a pistol in a drawer. (Doc. # 47, at 26–27, 54, 57.)

---

[4] The Magistrate Judge found that Gonzalez-Zea "was not detained or placed under arrest" during the stop. (Doc. # 56, at 3.) Though he was not arrested, he was certainly detained. *See United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999).

Gonzalez-Zea is now charged with a single count of being an illegal alien in possession of a firearm and live ammunition, a violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). (Doc. # 15, at 1.) Gonzalez-Zea moved to suppress the evidence "recovered as a result of an unlawful traffic stop and unreasonable detention." (Doc. # 28, at 1.) The Magistrate Judge held an evidentiary hearing at which Officers Purdy, Skillern, and Hinkle testified. (Doc. # 47.) The Magistrate Judge recommended denying the motion to suppress. (Doc. # 56.) Gonzalez-Zea filed written objections to the Recommendation. (Doc. # 57.) For the reasons that follow, the Recommendation is due to be modified in accordance with this Memorandum Opinion and Order, and the motion to suppress is due to be denied.

## IV. DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The officers seized Gonzalez-Zea when they stopped his car, and they searched his home when they went inside to look around. Gonzalez-Zea argues that the seizure was unconstitutional because the officers' suspicions were unreasonable and because the stop was overbroad. He also contends that the officers did not get valid consent to search his home. But his arguments are not persuasive.

**A.** **The vehicle stop did not violate the Fourth Amendment because the officers had reasonable suspicion to stop Gonzalez-Zea's car and because they did not unreasonably extend that stop.**

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "even in the absence of probable

cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity." *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)). But there are limits on when law-enforcement officers can make a so-called "*Terry* stop." *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004). One limit is that the stop must be "justified at its inception," *Terry*, 392 U.S. at 20, meaning that the officers must have a "reasonable suspicion" of criminal activity, *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Another limit is that the seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. Gonzalez-Zea argues that the officers here violated both limits. They did not.

1. ***The officers had reasonable suspicion to stop Gonzalez-Zea's car because they saw him leave a house linked to a fugitive.***

The "reasonable suspicion" threshold for a *Terry* stop requires that an officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the seizure. *Tapia*, 912 F.2d at 1370 (quoting *Terry*, 392 U.S. at 21). That is, the officer must have more than a "hunch." *Terry*, 392 U.S. at 27. There must be "at least a minimal level of objective justification for making the stop." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). And generally, reasonable suspicion "must attach to the particular person stopped." *United States*

*v. Lewis*, 674 F.3d 1298, 1305 (11th Cir. 2012) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

But even though a "hunch" is not enough to justify a *Terry* stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Officers may develop reasonable suspicion "by observing exclusively legal activity." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). And reasonable suspicion must be based on the "totality of the circumstances," which "allows officers to draw on their experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Bautista-Silva*, 567 F.3d at 1272 (quoting *Arvizu*, 534 U.S. at 273).

According to Gonzalez-Zea, Officers Purdy, Skillern, and Hinkle could not have reasonably suspected "that Jose Alfaro-Aguilar was associated with — let alone actually lived in — the address in Heflin; or that Mr. Gonzalez-Zea was Mr. Alfaro-Aguilar." (Doc. # 57, at 11.) Not so. Based on the totality of the circumstances, the officers had reasonable suspicion to believe that the man they saw leaving the house at 30926 Highway 431 was the fugitive Jose Alfaro-Aguilar. They were therefore permitted to stop and identify him.

Officer Purdy testified that he got a lead from his colleagues in Atlanta that Alfaro-Aguilar might be in Heflin. When Purdy went to verify that lead, he found that Alfaro-Aguilar and Jose Sanchez used the same Social Security number. The house at 30926 Highway 431 was the first listed possible address for Sanchez. A utility account had been opened at that house using the Social Security number shared between Alfaro-Aguilar and Sanchez. The officers went to the house looking for a Hispanic male, and they saw a man seen leave the house.

To be sure, the only link between Alfaro-Aguilar and Sanchez was that they had used the same Social Security number. (Doc. # 47, at 77.) Officer Purdy also testified that in cases like this, multiple people "typically" use the same Social Security number. (Doc. # 47, at 77.) And indeed, the report on Sanchez listed multiple aliases with the same Social Security number. (Doc. # 46-3, at 27–29.) But even if the odds were against Alfaro-Aguilar actually being the driver, that does not necessarily mean that the officers lacked reasonable suspicion. *See Sokolow*, 490 U.S. at 7–8. The officers had evidence linking Alfaro-Aguilar to the house, and Gonzalez-Zea emerged from the house, so the officers had reasonable suspicion to stop him.

**2.**     ***The officers did not unreasonably extend the stop because the seizure was brief, and the officers focused on the reason for the stop.***

Of course, it is not enough that the officers had reasonable suspicion to stop Gonzalez-Zea; the stop also had to be limited in scope. *Pruitt*, 174 F.3d at 1221.

Courts determine whether a *Terry* stop was overbroad by looking at several factors, including: "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *United States v. Simmons*, 172 F.3d 775, 780 (11th Cir. 1999) (quoting *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988)).

According to Gonzalez-Zea, the officers extended the stop too far when they continued to detain him even after they realized that he was not Alfaro-Aguilar. (Doc. # 57, at 13.) That argument fails. Officers Purdy, Skillern, and Hinkle did not detour from their search for Alfaro-Aguilar. They stopped Gonzalez-Zea to see if he was Alfaro-Aguilar, and Skillern's questions focused on establishing Gonzalez-Zea's identity and whether he or anyone else lived in the house. The fact that Gonzalez-Zea was not Alfaro-Aguilar did not rule out the possibility that Alfaro-Aguilar lived in the house. The officers did not search, arrest, or handcuff Gonzalez-Zea. And perhaps most importantly, Skillern's questions did not take too long; the stop did not last more than a "couple minutes."

Gonzalez-Zea asserts that Skillern should have accepted his Mexican ID card without asking for a driver's license (or why he did not have one). But when an officer pulls over a car, it is reasonable to ask for a driver's license. After all, state law requires that drivers have a license. *See* Ala. Code § 32-6-1(a). The U.S.

Supreme Court's decisions also "make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel*, 542 U.S. at 186; *see Adams v. Williams*, 407 U.S. 143, 146 (1972).

To be sure, an officer cannot ask questions unrelated to the reason for a vehicle stop "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). Officers cannot spend any more time than is "reasonably required to complete the stop's mission." *Id.* at 1616 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). But at the same time, an officer "may conduct certain unrelated checks," *id.* at 1615, and make "ordinary inquiries incident to the . . . stop," *id.* (quoting *Caballes*, 543 U.S. at 408); *see also United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)) (holding "unrelated questions posed during a valid *Terry* stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop'").

Sometimes it can be difficult to reconcile the command that an officer not prolong a stop with the officer's authority to ask unrelated questions. *See United States v. Green*, 897 F.3d 173, 181 (3d Cir. 2018) (noting the difficulty). But in this case, any of Skillern's questions that fell beyond the precise reason for the stop — finding out if Alfaro-Aguilar was the driver — were still "reasonably related in scope" to the reason for the stop. *Terry*, 392 U.S. at 20; *cf. United States v. Vargas*,

848 F.3d 971, 974 (11th Cir. 2017). They were, in other words, ordinary inquiries incident to the stop. Also, questions about Gonzalez-Zea's lack of a driver's license and whether he (or anyone else) lived in the house could not have taken more than a minute. And overall, Skillern acted diligently and reasonably. His questions therefore did not transform the stop into an unconstitutionally prolonged seizure. *See Griffin*, 696 F.3d at 1362.

### B. Gonzalez-Zea gave valid consent to the search of his home.

Even though the *Terry* stop of Gonzalez-Zea's car was valid, the search of his home is a separate question. The focus is on Gonzalez-Zea's consent to the search. "A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances." *Id.* (citing *Schneckloth*, 412 U.S. at 248–49).

Gonzalez-Zea argues that his consent was involuntary because it was obtained: "(1) by two armed law enforcement officers wearing law enforcement regalia; (2) during a stop in darkness on an isolated rural road; (3) while Mr. Gonzalez-Zea's identification card was in the possession of law enforcement officers; (4) while the red and blue police lights were still on; (5) without Mr. Gonzalez-Zea being informed that he was free to leave; and (6) without Mr.

Gonzalez-Zea having been informed of his *Miranda* rights or his right to refuse to consent." (Doc. # 57, at 16 n.10; *see* Doc. # 54, at 8–11.) Gonzalez-Zea's objections are certainly relevant in determining the validity of consent, but the totality of the circumstances shows that his consent was voluntary.

Like most law-enforcement officers, Skillern and Hinkle were armed. But neither officer drew his gun, and the mere presence of holstered firearms does not make consent involuntary. *See United States v. Drayton*, 536 U.S. 194, 205 (2002); *United States v. Perez*, 443 F.3d 772, 778 n.2 (11th Cir. 2006). The same is true of the officers' badges and other law-enforcement insignia. *See Drayton*, 536 U.S. at 204–05; *United States v. Villanueva-Fabela*, 202 F. App'x 421, 427 (11th Cir. 2006).

Though the stop happened before dawn on a relatively rural road, Gonzalez-Zea was in his car just down the road from his house. He was also on the side of a public highway, not in a police station or the back of a police car. Even if it was as early as 5:00 a.m., that would not necessarily invalidate his consent. *See United States v. James*, 423 F.2d 991, 992–93 (5th Cir. 1970) (affirming a district court's finding that consent to a search "in the dark hours of the morning" was valid).

The court assumes that Skillern's flashing red and blue lights were still on, meaning that Gonzalez-Zea was not free to leave. *See* Ala. Code § 13A-10-52(b); *id.* § 32-5-113(a). But a person can give consent to a search even when under arrest. *See, e.g.*, *United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v.*

*Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993). The question is not whether Gonzalez-Zea was free to leave immediately, but whether he was free to refuse consent. *See Purcell*, 236 F.3d at 1282 (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). Likewise, even assuming that Skillern had not returned Gonzalez-Zea's ID when he asked for consent, that would not necessarily negate consent. *Id.*

Skillern did not tell Gonzalez-Zea that he could refuse consent, but courts have repeatedly "rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *Drayton*, 536 U.S. at 206. And finally, the lack of a *Miranda* warning before the search "is only one factor in assessing voluntariness." *United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978); *see also United States v. Bates*, 840 F.2d 858, 861 (11th Cir. 1988).

Even viewing all six of Gonzalez-Zea's objections together, they do not show that his consent was invalid. That is because one must also consider the fact that Gonzalez-Zea: (1) was neither searched nor handcuffed; (2) drove his own car back to the house; and (3) unlocked the door and let the officers inside. Based on the totality of the circumstances, Gonzalez-Zea's consent was voluntary; it was the product of an essentially free and unconstrained choice.

## V. CONCLUSION

Upon careful consideration of the Motion to Suppress (Doc. # 28), the Magistrate Judge's Recommendation (Doc. # 56), and Gonzalez-Zea's objections to that Recommendation (Doc. # 57), and after a thorough review of the record, it is ORDERED that the Recommendation is ADOPTED as MODIFIED in accordance with this Memorandum Opinion and Order, Gonzalez-Zea's objections are OVERRULED, and the Motion to Suppress is DENIED.

DONE this 10th day of September, 2018.


_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE